IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD NAUSE, | ) | CASE NO. 3:14CV941 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Richard Nause ("Nause") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his application for

Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the

parties.  Doc. 13.

For the reasons stated below, the Commissioner's decision is **AFFIRMED**.

**I. Procedural History**

Nause protectively filed an application for DIB on July 29, 2010, alleging a disability

onset date of June 26, 2010.  Tr. 13, 159, 184.  He alleged disability based on the following:

chronic lower back pain while standing, sitting, walking; depression; sleep apnea; and lateral and

medial epicondylitis in his left and right elbow.  Tr. 204.  After denials by the state agency

initially (Tr. 105) and on reconsideration (Tr. 111), Nause requested an administrative hearing.

Tr. 114.  A hearing was held before Administrative Law Judge ("ALJ") Mary Peltzer on

December 17, 2012.  Tr. 33-71.  In her January 29, 2013, decision (Tr. 13-26), the ALJ

determined that there are jobs that exist in significant numbers in the national economy that Nause can perform, i.e., he is not disabled.  Tr. 25.  Nause requested review of the ALJ's decision by the Appeals Council (Tr. 110) and, on March 22, 2014, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Nause was born in 1960 and was 50 years old on the date his application was filed.  Tr. 184.  He graduated from high school.  Tr. 205.  He previously worked as a material handler at a Whirlpool factory from 1986 until 2010.  Tr. 196.

### B.  Relevant Medical Evidence[1]

On August 25, 2009, an imaging study of Nause's lumbar spine showed mild to moderate degenerative arthritic changes.  Tr. 351.   On August 26, 2009, he began physical therapy for low back pain.  Tr. 293-294.  He had poor compliance with his therapy.  Tr. 296.

On November 12, 2009, Nause presented to the Midwest Pain Treatment Center for lower back and hip pain.  Tr. 348.  Narendranath Lakshmipathy, M.D., diagnosed him with pain secondary to lumbosacral spondylosis with facet loading pain.  Tr. 348.  Dr. Lakshmipathy recommended aquatic therapy.  Tr. 348.

On January 3, 2010, Dr. Lakshmipathy performed a right sided L3-L4, L4-L5, and L5-S1 lumbar facet joint injection.  Tr. 345.  Nause reported "dramatic improvement" initially but the pain returned.  Tr. 339.  On January 18, 2010, he received a second set of injections.  Tr. 339.

---

[1]  Although Nause alleged disability based on mental and physical impairments, he only challenges the ALJ's decision with respect to his physical impairments.  Accordingly, the Court summarizes herein medical records concerning Nause's relevant physical impairments.

On March 18, 2010, Nause underwent a rhizotomy[2] using radiofrequency ablation of his right L3, L4 and L5 medial branches, performed by Dr. Lakshmipathy.  Tr. 325-326.

On August 3, 2010, Nause followed up at the Midwest Pain Treatment Center for his low back and right buttock pain.  Tr. 315.  He was seen by William Hogan, M.D.  Tr. 315.  Nause rated his pain as 6/10 and reported that it was worse with prolonged standing, walking, twisting, and transitional motions.  Tr. 315.  His pain was somewhat relieved by lying down.  Tr. 315. Upon physical examination, Nause demonstrated tenderness to palpation of his lumbosacral spine and paraspinal musculatures.  Tr. 315.  His pain was worse with extension of the lumbar spine and somewhat relieved with forward flexion and his facet loading maneuvers were positive. Tr. 315.  He had a normal gait and no spasms.  Tr. 315.  Dr. Hogan diagnosed him with lumbar disc displacement and lumbar spondylosis.  Tr. 315-316.  Nause was referred to physical therapy but was discharged after failing to attend his therapy sessions. Tr. 291.

On August 24, 2010, and September 7, 2010, Nause received caudal epidural steroid injections for pain associated with his lumbar disc displacement.  Tr. 312, 305.  In November 2010, Nause had an initial evaluation for aquatic therapy but again failed to attend his therapy sessions.  Tr. 362-363.

On December 1, 2010, Nause had an MRI which showed diffuse degenerative disease and moderate neural exit foraminal stenosis, bilaterally, worse at L4-5, and severe foraminal stenosis at L3-4 and L5-S1.   Tr. 588.  When compared to Nause's previous study, the MRI revealed mild progression of his degenerative disease.  Tr. 588.

On January 6, 2011, Nause saw Heather Haynes, M.D.  Tr. 385.  Nause reported that he had been on sick leave and was worried that he would lose his job if he did not go back to work.

---

[2]  Rhizotomy, also called a nerve block, is the destruction or dissolution of nerve tissue for pain relief.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1641, 1267.

Tr.  385.  He stated that the pain clinic was "done with him" and that a neurosurgeon he saw for back pain "did not think there was anything wrong, at least nothing surgical."  Tr. 385.  Nause complained that he was unable to stand for more than five to ten minutes without having back pain, he had difficultly twisting and turning, and he was unable to lift heavy things.  Tr. 385.

On February 7, 2011, Nause complained to Dr. Haynes of increased back pain.  Tr. 389. Upon examination, Nause had right paraspinous tenderness and trace edema in his lower extremities.  Tr. 389.  Dr. Haynes advised that the only thing that would help his pain is water therapy and weight loss.  Tr. 389.

Nause began aqua therapy in April 2011 and attended most of his sessions.  Tr. 470, 473-476, 480.  He received a TENS unit on May 25, 2011.  Tr. 481.  On July 20, 2011, Dr. Haynes provided a certificate to Nause's employer stating that Nause could return to work full time on August 17, 2011.  Tr. 522.

On September 15, 2011, Nause began seeing Hussam Elkambergy, M.D., complaining of back pain.  Tr. 462.  Upon examination, Nause's gait was normal.  Tr. 463.  He had medial tenderness in his lower back upon palpation and his surrounding tissue tension was described as "spasm."  Tr. 463.   Nause reported pain when he rose from a seated position and after prolonged standing.  Tr. 463.  Dr. Elkambergy diagnosed chronic back pain from spinal spondylosis.  Tr. 464.  He prescribed medication for pain and muscle spasms.  Tr. 464.  On September 19, 2011, Dr. Elkambergy listed Nause's gait as normal.  Tr. 461.

On October 11, 2011, Nause requested disability papers so that he could go back to work with restrictions on standing, twisting and turning.  Tr. 458.  Dr. Elkambergy noted that he was unable to complete any paperwork because "there is no job that would satisfy this requested

4

restriction[]" and because Nause needed a functional capacity evaluation before Dr. Elkambergy could fill out the disability form.  Tr. 458.

On February 23, 2012, Dr. Elkambergy's treatment note indicated that Nause was able to perform his activities of daily living without limitation and to work with limitations.  Tr. 568. Nause continued to see Dr. Elkambergy though November 2012.  Tr. 458, 460, 462, 487, 511, 514, 548, 587.  He continued to report similar pain symptoms as well as pain that was sharp and constant (Tr. 514), stiffness (Tr. 487), decreased range of motion (Tr. 460), radiating pain (Tr. 460), and pain while twisting, bending and turning (Tr. 458).  Dr. Elkambergy continued prescribing pain medication and muscle relaxants.  Tr. 488, 509, 587.  During this time Nause's weight hovered between 374 pounds and 395 pounds (Tr. 459, 463, 509, 514, 587), with a high of 406 pounds (Tr. 487).  He is 5'8".  Tr. 463.

### C.  Medical Opinion Evidence

#### 1.  Treating physician

On September 23, 2011, Dr. Elkambergy completed a form for Nause's employer.  Tr. 465.  Based on his examinations on September 15th and September 19th, Dr. Elkambergy listed the following objective findings: a stiff gait, decreased range of motion, and muscle spasms in Nause's spine.  Tr. 465.  Dr. Elkambergy noted that Nause reported worsening pain when standing, twisting, and turning.  Tr. 465.  Dr. Elkambergy restricted Nause to working 4-6 hours a day and to avoid prolonged standing, twisting, and repetitive turning movements. Tr. 465.

On October 5, 2011, a therapist filled out a Functional Capacity Evaluation.[3]  Tr. 467-469.  The therapist limited Nause to lifting 17.5 pounds occasionally and 12.5 pounds frequently for floor to waist lifting, level lift and overhead lift.  Tr. 468.  Nause's sitting capability was also restricted.  Tr. 469.

---

[3]  The therapist's name is illegible.  Tr. 469.

On April 15, 2012, Dr. Elkambergy completed a functional capacity evaluation.  Tr. 506-507.  Dr. Elkambergy opined that Nause could lift five to ten pounds; stand/walk for less than one hour per day, 5-10 minutes at a time; and sit 30 minutes per day.  Tr. 506.  He could rarely or never balance, crouch, kneel, or crawl, and could occasionally stoop.  Tr. 507.  Dr. Elkambergy explained that his assessment was based on Nause's own reports.  Tr. 507.  Dr. Elkambergy noted that additional breaks were needed as well as a sit/stand option. Tr. 507.  He listed Nause's pain as moderate to severe, worse with activity, and commented that Nause's pain was chronic and uncontrollable. Tr. 507.

On June 27, 2012, Dr. Elkambergy completed a form for Nause's employer.  Tr. 538-540.  Dr. Elkambergy indicated that Nause could seldom lift, push or pull one to eleven pounds.  Tr. 539.  He could seldom bend, stoop, climb, or perform repetitive work.  Tr. 539.  He could occasionally sit.  Tr. 539.  In an eight-hour workday, Nause could sit for one hour, stand for five minutes, walk for five minutes, and drive for thirty minutes.  Tr. 541.  Dr. Elkambergy wrote that Nause's recovery is "unexpected" and that he has no return date because he is unable to work.  Tr. 539.

### 2.  State Agency Reviewers

On March 11, 2011, Gerald Klyop, M.D., a state agency physician, reviewed Nause's file.  Tr. 78-79.  Regarding Nause's physical residual functional capacity (RFC), Dr. Klyop opined that Nause could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk and sit for a total of about six hours in an eight-hour workday; has an unlimited ability to push and pull; could never climb ladders, ropes and scaffolds; could frequently climb ramps and stairs; and could frequently balance, stoop, kneel, crouch and crawl.  Tr. 78-79.

On October 11, 2011, state agency physician Maureen Gallagher, D.O., reviewed Nause's record and affirmed Dr. Klyop's opinion.  Tr. 95-97.

### D.  Testimonial Evidence

#### 1.  Nause's Testimony

Nause was represented by counsel and testified at the administrative hearing.  Tr. 35-65. He is divorced and lives in a house with his adult daughter, her boyfriend, and his grandson.  Tr. 39.  He has a driver's license and drives about twice a week.  Tr. 40.  He drives to the store and to classes he attends at a community college.  Tr. 40.  These trips require a ten minute drive; he limits his driving because he finds it uncomfortable "to sit that long and drive."  Tr. 41.  He is able to sit through his classes lasting an hour and a half to three hours, but it is uncomfortable at times.  Tr. 41.

Nause testified that he worked at Whirlpool beginning in 1986 and ending in June 2010. Tr. 41, 43.  He stopped working because he could no longer perform his work duties.  Tr. 41-42. His duties included driving a forklift; getting on and off the forklift to stack boxes; stacking parts; putting parts on a pallet; and providing parts for the assembly line.  Tr. 42.  The heaviest he had to lift each day was between fifty and seventy-five pounds.  Tr. 42.  Previous jobs he performed at Whirlpool were primarily stand-up jobs.  Tr. 44.

Nause stated that he is unable to work because he has constant back pain and that every time he tried to lift or bend over his back gave out or caused so much pain he was unable to stand up straight and "a sensation" would travel down his right leg.  Tr. 44.   The pain is sharp and the more he moves the more painful it becomes.  Tr. 54.  Sitting or lying down helps relieve his radiating pain.  Tr. 54.  He also has sleep apnea and shortness of breath caused by his obesity. Tr. 54-55.

Nause stated that he tried to go back to work after June 2010 but the company doctor told him that he was unable to perform his work and he could not be released to do so unless he got a note from his doctor.  Tr. 46.  At that time, Nause was seeing Dr. Elkambergy.  Tr. 46.  He used to see Dr. Haynes, but stopped seeing Dr. Haynes because he was not satisfied with the treatment he was getting.  Tr. 47.  He stated that he did not think that Dr. Haynes was addressing his disability and pain issue.  Tr. 47.  Dr. Haynes recommended that he go to a pain management program, which he participated in, but his pain did not get better.  Tr. 47.  He takes medications for his pain but does not receive much relief from them.  Tr. 49.  He does not receive other forms of treatment.  Tr. 52.

Nause testified that he can sit for most of the day but that he has to shift his body every ten to fifteen minutes.  Tr. 55.  He can stand for about four minutes before the pain starts to increase.  Tr. 55.  He does not walk much.  Tr. 55.  When he drives to school he walks from the parking lot to the classroom and then needs to sit down because of the pain.  Tr. 55-56.  He uses a cane wherever he goes and uses a cart when he is in a store.  Tr. 55.  The cane is not prescribed and he started using it a month prior to the hearing.  Tr. 54, 65.

Nause stated that he can lift ten to twenty pounds and that he can carry five to fifteen pounds.  Tr. 56.  Lifting creates more pain so he has changed his lifestyle so that he does not have to lift.  Tr. 56.  He can reach to get something off a counter and above his head in a cupboard.  Tr. 57-58.  He can reach low if he supports himself on the counter.  Tr. 58.  He is unable to kneel, crouch or crawl and is unable to get down on the ground to play with his grandson.  Tr. 59.  He has problems getting in and out of chairs and gets a sharp pain in his back.  Tr. 58.  About once every three months the pain is so bad that he cannot get out of bed, and the pain does not go away for almost two weeks.  Tr. 59.

8

Nause testified that, on a typical day, he gets up and walks to the bathroom using the wall for support.  Tr. 60-61.  When he takes a shower he uses the wall or a rod for support.  Tr. 61.  He washes one hand at a time because it is too painful to bend over to wash both his hands together.  Tr. 61.  He goes into the kitchen, takes his medication, and sits down for one to two hours to read and watch television.  Tr. 61.  His daughter cooks for him but there are times when he will make a sandwich for himself.  Tr. 61.  His daughter also does all the cleaning, although Nause will occasionally put laundry in the washing machine.  Tr. 63.  At night he wears a mask for his sleep apnea.  Tr. 63.  He sleeps poorly because he has to keep shifting from one side to the other.  Tr. 63

### 2. Vocational Expert's Testimony

 Vocational Expert Mark Pinti ("VE") testified at the hearing.  Tr. 65-71.  The ALJ discussed with the VE Nause's past relevant work as a material handler.  Tr. 66-67.  The ALJ asked the VE to determine whether a hypothetical individual of Nause's age, education and work experience could perform the job he performed in the past if that person had the following characteristics: can perform medium work; can frequently climb stairs and ramps, cannot climb ladders, ropes, or scaffolds; can frequently balance, stoop, kneel, crouch, and crawl; should avoid concentrated exposure to unprotected heights; is limited to unskilled work, at an SVP of 1 or 2; cannot perform work where the pace of productivity is dictated by an external source over which the hypothetical individual has no control (such as assembly lines or conveyer belts); must perform in a static environment with routine and predictable duties that are explained or demonstrated when changes in tasks do occur; cannot have contact with the general public and only occasional contact with coworkers and supervisors, with no tandem work assignments.  Tr. 67.  The VE answered that such an individual could not perform Nause's past work because his

past work was heavy and semi-skilled.  Tr. 68.  The ALJ asked the VE if there was any work that

such an individual could perform.  Tr. 68.  The VE stated that such an individual could perform

jobs as a floor waxer (150 regional jobs, 200,000 national jobs), warehouse worker (400 regional

jobs, 250,000 national jobs), and industrial cleaner (1,000 regional jobs, 300,000 national jobs).

Tr. 68.

The ALJ next asked the VE whether the same hypothetical individual could perform any

jobs if the individual was limited to performing light work in a seated or standing position or a

combination thereof.  Tr. 68.  The VE answered that such an individual could perform jobs as a

laundry or garment folder (156 regional jobs; 70,000 national jobs); machine tender (600

regional jobs; 175,000 national jobs); and packager (100 regional jobs; 50,000 national jobs).  Tr.

68-69.  The VE further explained that the Dictionary of Occupational Titles does not address

sitting and standing and that the VE relied on his experience to answer that question.  Tr. 70.

The ALJ asked the VE what the ordinary breaks in a workday are, and the VE answered that

there is usually a fifteen to twenty minute break every two hours with a thirty to sixty minute

lunch break at the four-hour point.  Tr. 69.  The ALJ asked the VE what the "on-task"

requirement is and the VE stated, "a person has to be able to stay on task to the point where

they're doing assigned duties of the job, and I would estimate that if you were off task any more

than about an hour, or 15% of an eight-hour work day, beyond normal breaks, you would not be

able to keep a job."  Tr. 69.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her January 29, 2013, decision, the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.  Tr. 15.

2.  The claimant has not engaged in substantial gainful activity since June 26, 2010, the amended alleged onset date.  Tr. 15.

3.  The claimant has the following severe impairments: degenerative disc and joint disease and spondylosis, lumbar spine; obstructive sleep apnea; obesity; mental disorder variously diagnosed to include adjustment disorder, major depressive disorder, generalized anxiety disorder, bipolar disorder, post-traumatic stress disorder, dissociative disorder, attention deficit hyperactivity disorder (ADHD), eating disorder not otherwise specified.  Tr. 15.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 16.

5.  The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: work that can be done in a seated or standing position or combination thereof; frequent stairs and ramps; no ladders, ropes or scaffolds; frequent balancing, stooping, kneeling, crouching and crawling; avoid exposure to unprotected heights; unskilled work at an SVP of one or two with no work where the pace of productivity is dictated by an external source over which he has no control, such as assembly lines and conveyor belts and in a static work environment where duties are routine and predictable and changes in tasks are explained/demonstrated when they do occur; no contact with the general public; occasional contact with coworkers with no tandem work assignments; and occasional contact with supervisors.  Tr. 18.

6.  The claimant is unable to perform any past relevant work.  Tr. 24.

C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

7.     The claimant was born on April 22, 1960 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.  Tr. 24.

8.     The claimant has at least a high school education and is able to communicate in English.  Tr. 24.

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 24.

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 25.

11.    The claimant has not been under a disability, as defined in the Social Security Act, from June 26, 2010, through the date of this decision.  Tr. 25.

## V. Parties' Arguments

Nause objects to the ALJ's decision on three grounds.  He argues that the ALJ failed to follow the treating physician rule with respect to the weight she assigned the opinion of his treating physician, Dr. Elkamberg.  Doc. 15, p. 9.  He also argues that the ALJ erred when she assessed Nause's credibility and his morbid obesity.  Doc. 15, pp. 13-15.  In response, the Commissioner submits that the ALJ properly considered Dr. Elkambery's opinion, Nause's credibility, and his obesity.  Doc. 17, pp. 6-13.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 20 03).  "Substantial evidence is more than a scintilla of evidence but less

13

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 19*89) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 19*84).

### A.  The ALJ did not err when assessing Nause's credibility[5]

Nause argues that the ALJ did not perform a proper analysis of the credibility factors under SSR 96-7p when evaluating his credibility.  Doc. 15, p. 13.  To evaluate the credibility of a claimant's subjective reports of pain, an ALJ considers the following factors:  (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vii); *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 247 (6th Cir, 2007); SSR 96-7p, 1996 WL 374186, at *3.  "Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection

---

[5]  Because Nause's credibility factored into the ALJ's treatment of Dr. Elkambergy's opinion, the Court first discusses whether the ALJ properly assessed Nause's credibility.

with his or her complaints based on a consideration of the entire case record." *Rogers*, 486 F.3d at 247 (internal quotation marks omitted).  Although the ALJ need not analyze all factors listed above, *Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 733 (N.D.Ohio 2005), the ALJ's decision must be specific enough to make clear to the claimant and any subsequent reviewer the weight given to the claimant's statements and the reasons for that weight, *Rogers*, 486 F.3d at 248.

Here, the ALJ properly considered Nause's credibility pursuant to the regulations.  The ALJ considered Nause's treatment history for back pain.  Tr. 20; *see* 20 CFR 404.1529(c)(3)(v). Specifically, the ALJ commented that Nause's treatment has been "relatively conservative" and included medications, physical therapy, radiofrequency nerve ablation, epidural injections, and a TENS machine.  Tr. 19, 20, 21-22; *see* 20 CFR § 404.1529(c)(3)(iv).  She commented that Nause had seen a neurosurgeon who did not think there was anything wrong with his back and that there was nothing that surgery would remedy; she cited a treatment note by Nause's former treating physician, Dr. Haynes, advising, "[T]he only thing that would help [Nause's] back pain [i]s exercise and weight loss."  Tr. 20.   The ALJ observed that Nause was twice discharged for his failure to comply with his physical therapy treatment programs.  Tr. 20; *see Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) (An ALJ may consider a claimant's failure to seek treatment in assessing the claimant's credibility); SSR 96-7p, 1996 WL 374186, at *7.  The ALJ pointed out that Nause pursued a treatment relationship with Dr. Elkambergy only after Dr. Haynes submitted a work certificate on Nause's behalf stating that Nause could return to work full time with no restrictions.  Tr. 20-21.

The ALJ also considered Nause's daily activities.  20 C.F.R. § 404.1529(c)(3)(i).  She referred to Nause's indications in a function report that he was able to clean and do laundry and

repairs around the house with rest breaks. Tr. 19. She commented that a November 2011 treatment note revealed that Nause was able to engage in activities of daily living with limitations (Tr. 21, 487) and, by 2012, Nause was able to engage in activities of daily living without limitations (Tr. 568) and his spine disease was described as "improving" (Tr. 22, 587). She commented that Nause is able to drive and that he testified he attended classes at a local community college that required him to sit for an hour and a half to three hours. Tr. 19, 41. She pointed out inconsistencies in the record with respect to Nause's ability to ambulate. Tr. 21 (noting that Nause consistently had a normal gait and coordination and a full range of motion; only in July 2012 was Nause's gait described as "stiff."). She noted that Nause does not require an assistive device and that he testified at the hearing that he purchased a cane on his own. Tr. 20, 56.

Nause contends that his complaints of pain at the hearing were consistent with Dr. Elkambergy's April 2012 "assessment of intractable pain." Doc. 15, p. 14 (citing Tr. 507). This argument misses the mark; as the ALJ observed, Dr. Elkambergy's "assessment" was based on Nause's subjective complaints of pain. Tr. 22, 507 (Dr. Elkambergy's opinion explaining functional limitations as described "per patient"). Nause's next assertion, that the ALJ "should have looked at the medications that were prescribed," is without merit; the ALJ did consider the medications prescribed to Nause. Tr. 21-22 (noting Nause had been prescribed Lyrica, "Flexuril, Tramadol, synthoid, meloxicam, Protinix, Effexor and Lipitor."). Nause claims that he attended "physical/aqua therapy on a number of occasions without any relief" (Doc. 15, p. 15); he fails to note that he was discharged twice for non-compliance. Finally, Nause argues that, although the ALJ referenced his back pain treatment, "[s]he did not provide a proper analysis of these factors." Doc. 15, p. 15. The Court disagrees. The ALJ considered Nause's treatment for back

pain and noted that it was "relatively conservative"; remarked upon Nause's noncompliance with therapy; observed that Dr. Haynes, Nause's former treating physician, indicated that he could return to work full-time in August 2011; referenced a neurosurgeon's opinion that there was "nothing wrong, at least nothing surgical" with Nause's back; commented that Nause reportedly did not believe he could return to work and detailed his efforts to receive unemployment benefits and further work restrictions.  Tr. 20.  Notably, Nause does not explain how the limitations in the ALJ's RFC assessment limiting him to light work with additional restrictions do not account for his functional limitations.

In sum, the ALJ's decision is specific enough to make clear her credibility assessment, *Rogers*, 486 F.3d at 248, and her assessment is supported by substantial evidence and must be upheld, *Garner*, 745 F.2d at 387.

### B.  The ALJ did not err when considering Dr. Elkambergy's opinion

The ALJ gave "little weight" to the opinions expressed by Nause's physician, Dr. Elkambergy.  Tr. 22.  Nause argues that the ALJ improperly applied the treating physician rule with respect to Dr. Elkambergy's opinion. Doc. 15, p. 14.  Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In

deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole.  *See* 20 C.F.R. § 416.927(a)-(d); *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

To recap: in April 2012 Dr. Elkambergy limited Nause to lifting and carrying five to ten pounds; walking less than five minutes for no more than one hour total a day; sitting for no more than a half-hour a day; and rarely or never climbing, balancing, crouching, kneeling, or crawling and occasionally stooping.  Tr. 506.  In June 2012 Dr. Elkambergy restricted Nause to seldom lifting and pulling one to eleven pounds and occasional sitting.  Tr. 539.  He opined that Nause is not able to work and that recovery from his back pain is unexpected.  Tr. 539.

The ALJ did not err in assigning little weight to Dr. Elkambergy's opinion.  The ALJ explained that she did not give controlling weight to Dr. Elkambergy's opinion because "his opinions are not consistent with the totality of the record" and that "treatment records do not show the type of treatment or physical findings one would expect with the opinions expressed by [] Dr. Elkambergy."  Tr. 22.  She pointed out that Dr. Elkambergy relied heavily on Nause's subjective reports of symptoms and limitations without question, despite previously discussed concerns about Nause's credibility.  Tr. 22.  *See Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) (substantial evidence supports ALJ's finding that treating physician's opinion is not entitled to deference because it was based on claimant's subjective complaints).  The ALJ also remarked that Nause sought out Dr. Elkambergy only after Dr. Haynes declined to submit favorable work summaries to Nause's employer.  Tr. 22.  Lastly, the ALJ noted that Dr. Elkambergy's opinion that Nause is "unable to work" is not persuasive because (1) there is no indication that Dr. Elkambergy is familiar with the definition of "disability" pursuant to the

Social Security Act and (2) the opinion does not specify whether Dr. Elkambergy opined that Nause was unable to perform his past work or was unable to perform any work.  Tr. 22.

Nause argues that Dr. Elkambergy's opinion is entitled to "substantial" weight because it is supported by the medical evidence.  Doc. 15, p. 11.  Nause cites his MRI results and physical exam findings by Dr. Elkambergy finding that Nause had tenderness to palpation in his back and muscle spasms.  Doc. 15, p. 11.  These alone do not support the severe restrictions found in Dr. Elkambergy's opinion.  Tr. 351 (2009 MRI showing mild to moderate degenerative changes); 588 (2010 MRI showing mild progression).  Nause also contends that Dr. Elkambergy reported a stiff gait and decreased range of motion.  Doc. 15, p. 11 (citing Tr. 465).  However, Dr. Elkambergy's opinion reporting a stiff gait and decreased range of motion was based on examinations occurring on September 15, 2011, and September 19, 2011; yet at neither visit did Dr. Elkambergy observe a stiff gait or reduced range of motion.  Tr. 465 (opinion), 463 (9/15 treatment note listing gait as normal; full range of motion in neck; normal reflexes in spine and normal coordination globally), 461 (9/19 treatment note listing gait as normal; full range of motion in head and neck; normal reflexes in spine and normal coordination globally).

Nause identifies a therapist's initial evaluation form for physical therapy in 2010 that shows he had decreased strength and stability and two treatment notes from Dr. Haynes indicating that he had a reduced range of motion.  Doc. 15, p. 12 (citing Tr. 352 (initial therapy evaluation), 385, 393 (Dr. Hayne's treatment notes).  Again, this does not show that Nause was as restricted as Dr. Elkambergy indicated; indeed, Dr. Haynes stated that Nause could return to work despite her findings.  Tr. 522.  Thus, Nause's arguments are not compelling; moreover, even if there is evidence in the record that could support Dr. Elkambergy's opinion, there is also substantial evidence in the record that supports the ALJ's decision; the ALJ's decision, therefore,

must be upheld.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476-477 (6th Cir. 2003) (the

Commissioner's decision is upheld so long as substantial evidence supports the ALJ's

conclusion.).

Finally, Nause criticizes the ALJ for "impl[ying] that there may be secondary reasons for

Dr. Elkambergy's opinion—yet did so without there being such proof in the record."  Doc. 15, p.

13.  In her decision, the ALJ explained,

> [T]he possibility always exists that a doctor may express an opinion in an effort to assist a
> patient with whom he or she sympathizes for one reason or another.  Another reality,
> which should be mentioned, is that patients can be quite insistent and demanding in
> seeking supportive notes or reports from their physicians, who might provide such notes
> in order to satisfy their patients' requests and avoid unnecessary doctor/patient tension.
> Here, the record clearly indicates that the claimant sought treatment from Dr. Elkambergy
> when his prior treating physician would no longer submit favorable work summaries to
> his former employer.  While it is difficult to confirm the presence of such motives, they
> are more likely in situations where the opinion in question departs substantially from the
> rest of the evidence of record, as in the current case.

Tr. 22.

Nause does not challenge the ALJ's statement that he sought treatment from Dr.

Elkambergy after Dr. Haynes would not provide him with favorable work summaries.  The ALJ

did not err when she pointed out this fact and commented that a secondary motive, while difficult

to confirm, is more likely given that Dr. Elkambergy's opinion departed substantially from the

other evidence of record.  These statements do not result in an improper decision warranting

reversal.  The ALJ provided "good reasons" in her decision for the weight she gave to Dr.

Elkambergy's opinion that were specific enough to make clear to the Court her reasons for that

weight.  *See Wilson*, 378 F.3d at 544.

### C.  The ALJ did not err when considering Nause's obesity

Nause argues that the ALJ failed to perform an analysis of his obesity as required by SSR

02-1p.  Doc. 15, pp. 15-16.  SSR 02–1p explains that, although obesity no longer qualifies as a

"listed impairment," the Ruling seeks to "remind adjudicators to consider [obesity's] effects when evaluating disability." SSR 02–1p, 2002 WL 34686281, at *1; *Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. App'x 435, 442 (6th Cir. 2010).  The Ruling, however, does not offer "any particular procedural mode of analysis for obese disability claimants." *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 412 (6th Cir. 2006).  Instead, it provides that "obesity, in combination with other impairments, 'may' increase the severity of the other limitations." *Id*.

Here, the ALJ found that Nause's obesity was a severe impairment.  Tr. 15.  She noted that she considered his obesity when she evaluated Nause's disability.  Tr. 16.  She remarked that Nause testified at the hearing that his obesity causes breathing problems (*see* Tr. 54) and the ALJ discussed his obesity in relation to his sleep apnea.  Tr. 19-20.  The ALJ also commented that, with respect to Nause's back pain, treatment records noted that obesity was still a risk factor but that he lost about twenty pounds with diet and exercise and that his lumbar spine impairment was improving.  Tr. 22, 587.

Nause contends that the ALJ failed to properly analyze his obesity because she did not "identif[y] what Mr. Nause's weight was" or specifically use the word "morbid" to describe his obesity.  Doc. 15, pp. 16-17.  Nause provides no legal authority that requires an ALJ to specifically state a claimant's weight; moreover, the ALJ's failure to include the word "morbid" in describing his obesity does not show that the ALJ failed to properly analyze his obesity.  Notably, Nause does not identify evidence in the record demonstrating that his obesity caused greater impairments that those provided for in the ALJ's RFC assessment.  *See Essary v. Comm'r of Soc. Sec.*, 114 Fed. App'x 662, 667 (6th Cir. 2004) ("The absence of further elaboration on the issue of obesity likely stems from the fact that Essary failed to present evidence of any functional limitations resulting specifically from her obesity.").  The ALJ

properly considered Nause's obesity in evaluating his disability and her decision was not, therefore, erroneous.

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED.**

Dated: April 15, 2015

Kathleen B. Burke
United States Magistrate Judge